[918 NE2d 900, 890 NYS2d 388]

AMY L. ROBERTS et al., on Behalf of Themselves and All Others Similarly Situated, Respondents, v TISHMAN SPEYER PROPERTIES, L.P., et al., Appellants.

Argued September 10, 2009; decided October 22, 2009

**POINTS OF COUNSEL**

*Skadden, Arps, Slate, Meagher & Flom LLP,* New York City (*Jay B. Kasner, Scott D. Musoff, Jonathan Frank* and *Christopher R. Gette* of counsel), and *Belkin Burden Wenig & Goldman, LLP* (*Sherwin Belkin* and *Magda Cruz* of counsel), for Tishman Speyer Properties, L.P., and another, appellants. I. The plain language of the Rent Stabilization Law permits luxury deregulation for previously stabilized buildings such as Peter Cooper Village and Stuyvesant Town. (*Pultz v Economakis,* 10 NY3d 542; *State of New York v Patricia II.,* 6 NY3d 160; *Jones v Bill,* 10 NY3d 550; *Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal,* 5 NY3d 303; *Samiento v World Yacht Inc.,* 10 NY3d 70; *In re Princo Corp.,* 478 F3d 1345; *State of New York v Fashion Place Assoc.,* 224 AD2d 280; *Matter of Tall Trees Constr. Corp. v Zoning Bd. of Appeals of Town of Huntington,* 97 NY2d 86; *Rangolan v County of Nassau,* 96 NY2d 42; *Federal Home Loan Mtge. Corp. v New York State Div. of Hous. & Community Renewal,* 87 NY2d 325.) II. The Appellate Division erroneously failed to consider that the Legislature's decision not to modify the deregulation provisions supports the Division of Housing and Community Renewal's interpretation and dismissal of the complaint. (*Matter of Patton Indus. v New York City Conciliation & Appeals Bd.,* 97 AD2d 716; *Rent Stabilization Assn. of N.Y. City v Higgins,* 83 NY2d

156; *Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal,* 5 NY3d 303; *Matter of Versailles Realty Co. v New York State Div. of Hous. & Community Renewal,* 76 NY2d 325; *Matter of Nicholas v Kahn,* 47 NY2d 24; *Raffellini v State Farm Mut. Auto. Ins. Co.,* 9 NY3d 196; *Federal Home Loan Mtge. Corp. v New York State Div. of Hous. & Community Renewal,* 854 F Supp 151, 83 F3d 45; *Riverside Syndicate, Inc. v Munroe,* 10 NY3d 18; *Matter of Howard v Wyman,* 28 NY2d 434; *Engle v Talarico,* 33 NY2d 237.) III. The Appellate Division's "policy" concerns are irrelevant and unfounded. (*Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal,* 5 NY3d 303; *Matter of Raritan Dev. Corp. v Silva,* 91 NY2d 98; *People ex rel. Jenkins v Piscotti,* 52 AD3d 1207; *Matter of Mougiannis v North Shore-Long Is. Jewish Health Sys., Inc.,* 25 AD3d 230.) IV. The decision's abrupt departure from prior interpretation supports reversal, but in the event the decision is affirmed, any remedy should not be retroactively applied to defendants. (*Chevron Oil Co. v Huson,* 404 US 97; *Gurnee v Aetna Life & Cas. Co.,* 55 NY2d 184; *Riverside Syndicate, Inc. v Munroe,* 10 NY3d 18; *Matter of King v Cuomo,* 81 NY2d 247; *Matter of Hilton Hotels Corp. v Commissioner of Fin. of City of N.Y.,* 219 AD2d 470; *Busa v Busa,* 196 AD2d 267.)

*Greenberg Traurig, LLP,* New York City (*Alan Mansfield, Daniel J. Ansell* and *Steven Kirkpatrick* of counsel), for Metropolitan Insurance and Annuity Company and another, appellants. I. The order of the Appellate Division should be reversed. (*Riverside Syndicate, Inc. v Munroe,* 10 NY3d 18; *Matter of Radich v Council of City of Lackawanna,* 93 AD2d 559; *Matter of Salvati v Eimicke,* 72 NY2d 784, 73 NY2d 995; *Matter of Gaines v New York State Div. of Hous. & Community Renewal,* 90 NY2d 545; *Matter of Ansonia Residents Assn. v New York State Div. of Hous. & Community Renewal,* 75 NY2d 206; *Matter of ATM One, LLC v New York State Div. of Hous. & Community Renewal,* 37 AD3d 714; *Matter of Ardor Mgt. Corp. v Division of Hous. & Community Renewal of State of N.Y.,* 104 AD2d 984; *Engle v Talarico,* 33 NY2d 237; *Demette v Falcon Drilling Co., Inc.,* 280 F3d 492; *Walsh v Wusinich,* 32 AD3d 743.) II. Principles of equity dictate that the Appellate Division's order, if affirmed, should have only prospective effect. (*Chevron Oil Co. v Huson,* 404 US 97; *Gurnee v Aetna Life & Cas. Co.,* 55 NY2d 184; *Matter of Hilton Hotels Corp. v Commissioner of Fin. of City of N.Y.,* 219 AD2d 470; *Riverside Syndicate, Inc. v Munroe,* 10 NY3d 18; *Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451.)

*Wolf Haldenstein Adler Freeman & Herz LLP,* New York City (*Alexander H. Schmidt, Daniel W. Krasner* and *Eric B. Levine* of counsel), and *Bernstein Liebhard LLP* (*Ronald J. Aranoff, Stanley Bernstein* and *Christian Siebott* of counsel) for respondents. I. The Real Property Tax Law and Rent Stabilization Law require that the complex remain rent stabilized until the owners' J-51 benefits expire. (*Matter of Schmidt v Roberts,* 74 NY2d 513; *Matter of Agioritis,* 52 AD2d 128; *Matter of Raritan Dev. Corp. v Silva,* 91 NY2d 98; *Alweis v Evans,* 69 NY2d 199; *Walsh v Wusinich,* 32 AD3d 743; *Matter of Consolidated Edison Co. of N.Y. v Department of Envtl. Conservation,* 71 NY2d 186; *People v Marrero,* 71 AD2d 346; *Matter of Tall Trees Constr. Corp. v Zoning Bd. of Appeals of Town of Huntington,* 97 NY2d 86; *Denza v Independence Plaza Assoc., LLC,* 17 Misc 3d 1122[A], 2007 NY Slip Op 52106[U]; *Matter of Bello v Roswell Park Cancer Inst.,* 5 NY3d 170.) II. The Appellate Division's reading of the statute avoids inequitable and unreasonable results. (*Long v State of New York,* 7 NY3d 269; *People v Santi,* 3 NY3d 234; *People v Kramer,* 92 NY2d 529; *Milbrandt v Green Refractories Co.,* 79 NY2d 26; *Matter of Ellington Constr. Corp. v Zoning Bd. of Appeals of Inc. Vil. of New Hempstead,* 77 NY2d 114.) III. The Appellate Division properly did not defer to the Division of Housing and Community Renewal on this matter of statutory interpretation. (*Matter of Gruber [New York City Dept. of Personnel—Sweeney],* 89 NY2d 225; *Matter of Ansonia Residents Assn. v New York State Div. of Hous. & Community Renewal,* 75 NY2d 206; *Matter of Schenectady Police Benevolent Assn. v New York State Pub. Empl. Relations Bd.,* 85 NY2d 480; *Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal,* 5 NY3d 303; *Matter of Madison-Oneida Bd. of Coop. Educ. Servs. v Mills,* 4 NY3d 51; *Matter of Richardson v Commissioner of N.Y. City Dept. of Social Servs.,* 88 NY2d 35; *Matter of Charles A. Field Delivery Serv. [Roberts],* 66 NY2d 516; *Two Assoc. v Brown,* 127 AD2d 173; *Boreali v Axelrod,* 71 NY2d 1; *Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451.) IV. The Division of Housing and Community Renewal regulations conflict with the statute. (*Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451; *Festa v Leshen,* 145 AD2d 49; *Matter of Nicholas v Kahn,* 47 NY2d 24.) V. Defendants' legislative "acquiescence" argument is baseless. (*Matter of New York State Assn. of Life Underwriters v New York State Banking Dept.,* 83 NY2d 353; *Clark v Cuomo,* 66 NY2d 185; *Rent Stabilization Assn. of N.Y. City v Higgins,* 83 NY2d 156; *Matter of Ansonia Residents Assn. v New York State Div. of Hous. & Community Renewal,* 75 NY2d

206; *Engle v Talarico,* 33 NY2d 237; *RKO-Keith-Orpheum Theatres, Inc. v City of New York,* 308 NY 493; *Brooklyn Union Gas Co. v New York State Human Rights Appeal Bd.,* 41 NY2d 84; *Samiento v World Yacht Inc.,* 10 NY3d 70; *Raffellini v State Farm Mut. Auto. Ins. Co.,* 9 NY3d 196; *Matter of Versailles Realty Co. v New York State Div. of Hous. & Community Renewal,* 76 NY2d 325.) VI. Defendants' public policy arguments are impermissible and, in any event, are speculative and unpersuasive. VII. The Appellate Division's decision should be retroactive. (*Gurnee v Aetna Life & Cas. Co.,* 55 NY2d 184; *United States v Security Industrial Bank,* 459 US 70; *Kuhn v Fairmont Coal Co.,* 215 US 349; *People v Favor,* 82 NY2d 254; *Linkletter v Walker,* 381 US 618; *People v Pepper,* 53 NY2d 213; *Desist v United States,* 394 US 244; *Gager v White,* 53 NY2d 475; *Chevron Oil Co. v Huson,* 404 US 97; *Landgraf v USI Film Products,* 511 US 244.)

*Legal Aid Society, Harlem Community Law Office,* New York City (*Steven Banks* and *Alan Canner* of counsel), for Legal Aid Society, amicus curiae. I. The Appellate Division's decision correctly interprets Rent Stabilization Law ([RSL] Administrative Code of City of NY) § 26-504 (c), and its interpretation is in harmony with RSL §§ 26-504.1 and 26-504.2 (a). (*Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal,* 5 NY3d 303; *New York City Campaign Fin. Bd. v Ortiz,* 38 AD3d 75; *Majewski v Broadalbin-Perth Cent. School Dist.,* 91 NY2d 577; *People v Mobil Oil Corp.,* 48 NY2d 192; *Friedman v Connecticut Gen. Life Ins. Co.,* 9 NY3d 105; *Matter of Briffel v County of Nassau,* 31 AD3d 79.) II. The receipt of J-51 tax benefits subjects all apartments to rent stabilization as landlords who receive J-51 tax benefits agree to be governed by rent regulatory statutes. (*Denza v Independence Plaza Assoc., LLC,* 17 Misc 3d 1122[A], 2007 NY Slip Op 51106[U]; *State of New York v Fashion Place Assoc.,* 224 AD2d 280, 89 NY2d 917; *Kent v Bedford Apts. Co.,* 237 AD2d 140; *546 W. 156th St. HDFC v Smalls,* 43 AD3d 7; *12-62 Realty Corp. v Scapula,* 2 Misc 3d 132[A], 2004 NY Slip Op 50131[U].)

*Meister Seelig & Fein LLP,* New York City (*Stephen B. Meister* and *Thomas L. Friedman* of counsel), for Real Estate Board of New York, amicus curiae. I. The judicial construction of Rent Stabilization Law (Administrative Code of City of NY) §§ 26-504.1 and 26-504.2 (a) advanced in the appellate decision contradicts established precedents and will have grave consequences for owners of New York City apartment buildings and

their lenders, as well as New York City and state as a whole and therefore must be reversed. II. The Appellate Division's construction of Rent Stabilization Law §§ 26-504.1 and 26-504.2 (a) is incorrect.

*Himmelstein, McConnell, Gribben, Donoghue & Joseph,* New York City (*David S. Hershey-Webb, William J. Gribben* and *Ronald S. Languedoc* of counsel), for New York State Tenants & Neighbors Coalition, Inc. and another, amici curiae. I. The Appellate Division correctly determined that the express language of the statute provided that all units for which the owner receives J-51 benefits may not be deregulated, regardless of how or when the units first became rent stabilized. (*Majewski v Broadalbin-Perth Cent. School Dist.,* 91 NY2d 577; *Matter of Alonzo M. v New York City Dept. of Probation,* 72 NY2d 662; *State of New York v Fashion Place Assoc.,* 224 AD2d 280.) II. The legislative history of the Decontrol Law supports the Appellate Division's construction of the statute. III. The Appellate Division correctly found that the Decontrol Law is to be interpreted in a manner consistent with the purpose of the J-51 Law and the rent laws. (*518 E. 13th Owner, LLC v Ellis,* 22 Misc 3d 446; *Matter of Bleecker St. Mgt. Co. v New York State Div. of Hous. & Community Renewal,* 284 AD2d 174, 97 NY2d 606; *Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal,* 5 NY3d 303; *Drucker v Mauro,* 30 AD3d 37, 7 NY3d 844; *Pultz v Economakis,* 40 AD3d 24, 10 NY3d 542.) IV. Defendants' misapplication of the Decontrol Law has resulted in a loss of affordable housing. (*Jemrock Realty Co. LLC v Krugman,* 64 AD3d 290; *Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal,* 6 AD3d 28, 5 NY3d 303.) V. Neither the Division of Housing and Community Renewal's misinterpretation of the law nor the Department of Housing Preservation and Development's policies provide a basis to reverse the court below. (*Matter of Community Hous. Improvement Program v New York State Div. of Hous. & Community Renewal,* 230 AD2d 66; *Doctors Council v New York City Employees' Retirement Sys.,* 71 NY2d 669; *Matter of Dworman v New York State Div. of Hous. & Community Renewal,* 94 NY2d 359; *Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451.)

*Borah, Goldstein, Altschuler, Nahins & Goidel, P.C.,* New York City (*Robert D. Goldstein, Paul N. Gruber* and *David B. Cabrera* of counsel), for Community Housing Improvement Program, Inc. and another, amici curiae. I. The construction of the

relevant statutes and regulations adopted by the Appellate Division will have severe and unwarranted consequences to all owners of units which had been properly exempted from rent stabilization under the previously unquestioned administrative interpretation upon which the real estate community relied. (*Noto v Bedford Apts. Co.,* 21 AD3d 762.) II. The presence of deregulated apartments in a J-51 building results in lower rents for current rent-stabilized tenants. III. The Supreme Court properly dismissed the complaint because the apartments at issue were properly deregulated as a matter of law. (*Matter of Prince Wooster Corp. v Tax Commn. of City of N.Y.,* 115 Misc 2d 100; *Matter of M.B.,* 6 NY3d 437; *Long v State of New York,* 7 NY3d 269; *Matter of Orens v Novello,* 99 NY2d 180; *Matter of Dworman v New York State Div. of Hous. & Community Renewal,* 94 NY2d 359; *Samiento v World Yacht Inc.,* 10 NY3d 70; *Majewski v Broadalbin-Perth Cent. School Dist.,* 91 NY2d 577; *Noto v Bedford Apts. Co.,* 21 AD3d 762; *Matter of 31171 Owners Corp. v New York City Dept. of Hous. Preserv. & Dev.,* 190 AD2d 441; *La Guardia v Cavanaugh,* 53 NY2d 67.)

*Elizabeth R. Fine, General Counsel, Council of the City of New York,* New York City (*Lauren G. Axelrod* and *Alvin L. Bragg, Jr.,* of counsel), for Maria del Carmen Arroyo and others, amici curiae. I. The First Department correctly held that the plain language of the Rent Regulation Reform Act makes clear that high rent decontrol does not apply to units in the J-51 program. (*Geissal v Moore Medical Corp.,* 524 US 74; *State of New York v Fashion Place Assoc.,* 224 AD2d 280; *Matter of DaimlerChrysler Corp. v Spitzer,* 7 NY3d 653; *Matter of Washington Post Co. v New York State Ins. Dept.,* 61 NY2d 557.) II. Appellants' argument ignores the legislative history of the Rent Regulation Reform Act, which clearly demonstrates that the Legislature intended to exempt all J-51 units from high rent decontrol. (*Majewski v Broadalbin-Perth Cent. School Dist.,* 91 NY2d 577; *Northeast Bancorp, Inc. v Board of Governors, FRS,* 472 US 159; *People ex rel. Davies v Cowles,* 13 NY 350.) III. Appellants' construction of the Rent Regulation Reform Act is at odds with other provisions of the Real Property Tax Law and Rent Stabilization Law which demonstrate the Legislature's long-standing intent that all J-51 units remain rent stabilized. (*Matter of Seaman,* 78 NY2d 451.) IV. The City Council intended that J-51 units be rent stabilized, and appellants fall far short of meeting the high standard of proving beyond a reasonable doubt that the Legislature intended to preempt the City Council. (*Matter of Spielvogel v Ford,* 1 NY2d 558; *Bates v Dow*

*Agrosciences LLC,* 544 US 431; *Incorporated Vil. of Nyack v Daytop Vil.,* 78 NY2d 500; *Le Drugstore Etats Unis v New York State Bd. of Pharm.,* 33 NY2d 298; *Matter of Pell v Coveney,* 37 NY2d 494; *Khrapunskiy v Doar,* 49 AD3d 201; *State of New York v Green,* 96 NY2d 403; *41 Kew Gardens Rd. Assoc. v Tyburski,* 70 NY2d 325; *Paterson v University of State of N.Y.,* 14 NY2d 432; *City of New York v Park S. Assoc.,* 139 Misc 2d 997.)

*Rosenberg & Estis, P.C.,* New York City (*Jeffrey Turkel* and *Nicholas Kamillatos* of counsel), for Rent Stabilization Association of NYC, Inc., amicus curiae. I. Rent Stabilization Law ([RSL] Administrative Code of City of NY) § 26-504 (c) does not apply to apartments that originally became subject to stabilization for reasons other than receiving J-51 benefits, which thereafter received such benefits, and does not bar luxury deregulation under RSL §§ 26-504.1 and 26-504.2. (*Matter of 275 Webster Tenants v Wright,* 238 AD2d 143; *La Guardia v Cavanaugh,* 53 NY2d 67; *Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal,* 5 NY3d 303; *8200 Realty Corp. v Lindsay,* 27 NY2d 124; *Riley v County of Broome,* 95 NY2d 455; *Matter of Metropolitan Life Ins. Co. v State Tax Commn.,* 80 AD2d 675, 55 NY2d 758; *Noto v Bedford Apts. Co.,* 21 AD3d 762.) II. Rent Stabilization Law ([RSL] Administrative Code of City of NY) §§ 26-504.1 and 26-504.2 allow apartments like those at Peter Cooper Village and Stuyvesant Town to be luxury deregulated, irrespective of how broadly RSL § 26-504 (c) is interpreted. (*Matter of Tall Trees Constr. Corp. v Zoning Bd. of Appeals of Town of Huntington,* 97 NY2d 86; *Matter of Dutchess County Dept. of Social Servs. v Day,* 96 NY2d 149; *People v Avilas, Inc.,* 29 AD3d 764; *Matter of Lupoli,* 275 AD2d 44, 99 NY2d 503; *Matter of Prospect v Cohalan,* 109 AD2d 210, 65 NY2d 867; *New York State Crime Victims Bd. v T.J.M. Prods.,* 265 AD2d 38; *People v Mobil Oil Corp.,* 48 NY2d 192; *Matter of Francois v Dolan,* 95 NY2d 33; *Erie County Water Auth. v Kramer,* 4 AD2d 545, 5 NY2d 954.) III. The Appellate Division, when construing Rent Stabilization Law ([RSL] Administrative Code of City of NY) §§ 26-504.1 and 26-504.2, failed to take into account the rent regulatory community's long-term practical construction of those provisions. (*Rent Stabilization Assn. of N.Y. City v Higgins,* 83 NY2d 156; *Department of Fin. of City of N.Y. v New York Tel. Co.,* 262 AD2d 96; *Matter of Kolb v Holling,* 285 NY 104; *Matter of Lockport Union-Sun & Journal v Preisch,* 8 NY2d 54; *Household Fin. Corp. v Goldring,* 263 App Div 524, 289 NY 574; *City of New York v New York City Ry. Co.,* 193 NY 543; *Matter of Niagara Falls Urban Renewal Agency v O'Hara,*

57 AD2d 471.) IV. Adopting the tenants' position would grant a windfall to undeserving tenants, and would adversely affect owners, lenders and the city's housing stock. (*Kraebel v New York City Dept. of Hous. Preserv. & Dev.*, 959 F2d 395; *Matter of 31171 Owners Corp. v New York City Dept. of Hous. Preserv. & Dev.*, 190 AD2d 441.)

*Jimmy Yan, General Counsel, Office of the Manhattan Borough President*, New York City, for Office of the Manhattan Borough President, amicus curiae. I. The Appellate Division correctly held that the high rent decontrol statute does not apply to units in the J-51 program. (*Demette v Falcon Drilling Co., Inc.*, 280 F3d 492; *Reid v Covert*, 354 US 1; *Pacific Gas Transmission Co. v Richardson's Recreational Ranch, Ltd.*, 9 F3d 1394; *Housing Auth. of Kaw Tribe of Indians of Okla. v City of Ponca City*, 952 F2d 1183; *Ramirez de Arellano v Weinberger*, 745 F2d 1500; *Dettmers v Commissioner of Internal Revenue*, 430 F2d 1019; *Anderson v McKay*, 211 F2d 798; *Barton v Smith*, 162 F2d 330; *Jay v Chicago Bridge & Iron Co.*, 150 F2d 247; *Dunlap v Kansas, Dept. of Health & Envt.*, 211 F Supp 2d 1334.) II. The Appellate Division's decision should be affirmed and applied retroactively to defendants and other landlords who have improperly deregulated apartment units while receiving J-51 benefits. (*Gurnee v Aetna Life & Cas. Co.*, 55 NY2d 184; *Gager v White*, 53 NY2d 475; *Chevron Oil Co. v Huson*, 404 US 97; *People v Favor*, 82 NY2d 254; *Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451; *Pachter v Bernard Hodes Group, Inc.*, 10 NY3d 609; *Radec Corp. v KMart Corp.*, 251 AD2d 1003; *Matter of Taihem F.*, 222 AD2d 322; *James v Liberty Lines*, 97 AD2d 749; *Matter of Bleecker St. Mgt. Co. v New York State Div. of Hous. & Community Renewal*, 284 AD2d 174.) III. Defendants' assertions of extreme economic impact are speculative and without merit. IV. Defendants' interpretation of the luxury decontrol statutes deprives New York City of the benefit of its bargain, undermining the public policy of strictly construing tax benefits to private parties at the expense of the taxpaying public. (*Matter of 31171 Owners Corp. v New York City Dept. of Hous. Preserv. & Dev.*, 190 AD2d 441; *Matter of City of Lackawanna v State Bd. of Equalization & Assessment of State of N.Y.*, 16 NY2d 222; *Matter of Howard v Wyman*, 28 NY2d 434.)

*Harvey Epstein*, New York City, for Urban Justice Center, amicus curiae. I. Allowing the premature deregulation of J-51 units directly conflicts with the purpose of the Rent Stabilization Law and will have devastating impacts on New York City's

tenants and its housing supply. (*Riverside Syndicate, Inc. v Munroe,* 10 NY3d 18; *245 Realty Assoc. v Sussis,* 243 AD2d 29.) II. The Appellate Division correctly interprets Rent Stabilization Law ([RSL] Administrative Code of City of NY) §§ 26-504.1 and 26-504.2 (a) to preclude beneficiaries of the J-51 program from using the RSL's "high rent" or "high income" exclusions to deregulate their rent-stabilized apartments. (*Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451; *Matter of Belmonte v Snashall,* 2 NY3d 560; *Matter of Moran Towing & Transp. Co. v New York State Tax Commn.,* 72 NY2d 166; *Matter of Dworman v New York State Div. of Hous. & Community Renewal,* 94 NY2d 359; *Long v State of New York,* 7 NY3d 269; *People v Santi,* 3 NY3d 234; *State of New York v Fashion Place Assoc.,* 224 AD2d 280; *Riley v County of Broome,* 95 NY2d 455; *Patrolmen's Benevolent Assn. of City of N.Y. v City of New York,* 41 NY2d 205; *Matter of Raritan Dev. Corp. v Silva,* 91 NY2d 98.)

*Collins Dobkin & Miller, LLP,* New York City (*Seth A. Miller* of counsel), for Mitchell-Lama Residents Coalition, amicus curiae. The language exempting J-51 assisted apartments from deregulation is designed to harmonize with the requirement of the J-51 program that every J-51 assisted apartment remain regulated throughout the benefits period. (*La Guardia v Cavanaugh,* 53 NY2d 67; *Pultz v Economakis,* 10 NY3d 542; *Demette v Falcon Drilling Co., Inc.,* 280 F3d 492; *Matter of Consolidated Edison Co. of N.Y. v Department of Envtl. Conservation,* 71 NY2d 186; *Davis v Michigan Dept. of Treasury,* 489 US 803; *Matter of Lower Manhattan Loft Tenants v New York City Loft Bd.,* 66 NY2d 298; *Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal,* 5 NY3d 303; *Matter of Sack v New York State Div. of Hous. & Community Renewal,* 250 AD2d 537; *State of New York v Fashion Place Assoc.,* 224 AD2d 280; *East W. Renovating Co. v New York State Div. of Hous. & Community Renewal,* 16 AD3d 166.)

## OPINION OF THE COURT

Per Curiam.

In this lawsuit, nine plaintiff tenants of Peter Cooper Village and Stuyvesant Town, two adjoining Manhattan apartment complexes comprising 110 buildings and occupying roughly 80 acres between 14th and 23rd Streets along the East River (the properties or the apartment complexes) contend that defendants Tishman Speyer Properties, L.P., and PCV ST Owner LP

(collectively, PCV/ST), and Metropolitan Insurance and Annuity Company and Metropolitan Tower Life Insurance Company (collectively, MetLife), the current and former owners of the properties, respectively, were not entitled to take advantage of the luxury decontrol provisions of the Rent Stabilization Law (RSL)[1] while simultaneously receiving tax incentive benefits under the City of New York's J-51 program. We agree.

## I.

In New York City, multiple dwellings may qualify for tax incentives designed to encourage rehabilitation and improvements (see Administrative Code of City of NY § 11-243 [previously § J51-2.5]). Specifically, the City's J-51 program, authorized by Real Property Tax Law § 489, allows property owners who complete eligible projects to receive tax exemptions and/or abatements that continue for a period of years. Eligible projects include moderate and gut rehabilitations; major capital improvements (for example, asbestos abatement or boiler replacement); and conversions of lofts and other nonresidential buildings into multiple dwellings (see Administrative Code § 11-243 [b] [2], [3], [8]; 28 RCNY 5-03 [a]). Rental units in buildings receiving these exemptions and/or abatements must be registered with the State Division of Housing and Community Renewal (DHCR), and are generally subject to rent stabilization for at least as long as the J-51 benefits are in force (see 28 RCNY 5-03 [f]). The Department of Housing Preservation and Development administers the J-51 program in the City of New York.

MetLife apparently first applied for and received J-51 benefits for the properties in 1992. At the time, the apartment complexes, which MetLife built in the 1940s, had already been rent-stabilized since at least 1974.

In 1993, the Legislature enacted the Rent Regulation Reform Act (RRRA) (L 1993, ch 253), which provided for the luxury decontrol or deregulation of certain rent-stabilized apartments. The RRRA identified two circumstances in which deregulation was warranted: (1) in vacant apartments where the legal regulated rent was $2,000 per month or more; and (2) in occupied apartments where the legal regulated rent was $2,000 per month or more and the combined annual income of all occupants exceeded $250,000 per year (RSL [Administrative Code]

---

1. The RSL is codified at Administrative Code of City of NY §§ 26-501 to 26-520.

§§ 26-504.1, 26-504.2). The RRRA carved out an exception to luxury decontrol, which stated: "this exclusion [i.e., luxury decontrol] shall not apply to housing accommodations which became or become subject to this law [i.e., the RSL] (a) by virtue of receiving tax benefits pursuant to section . . . four hundred eighty-nine of the real property tax law [J-51 benefits]" (RSL §§ 26-504.1, 26-504.2 [a]). The Legislature subsequently expanded the scope of luxury decontrol by lowering the income threshold for defining high-income households to $175,000 and allowing postvacancy improvements to count toward the $2,000 per month rent threshold (L 1997, ch 116); and permitting deregulated units to remain deregulated even if an owner subsequently charges less than the $2,000 per month threshold (L 2003, ch 82).

On January 16, 1996—prior to the 1997 amendments to the RRRA—DHCR issued an advisory opinion, which stated that participation in the J-51 program only precluded luxury decontrol "where the receipt of such benefits is the *sole reason* for the accommodation being subject to rent regulation" (emphasis added). On its face, the DHCR advisory opinion relies exclusively on a textual interpretation of the RRRA's relevant provisions. Further, DHCR took the position that

> "where Luxury Decontrol is applied before the 'J-51' tax benefit period has expired, the abatement should be reduced proportionately. That the Legislature recognized the inherent inequity of an owner's continuing to enjoy tax benefits after decontrol is apparent from RPTL Section 489 7 (b) (1), which provides that as to . . . [']any multiple dwelling, building or structure which is decontrolled subsequent to the granting of such benefits, the local legislative body or other governing agency may withdraw such benefits from such dwelling.' "

In April 2000, DHCR proposed changes to the Rent Stabilization Code (RSC) in order to "conform regulations to statutes, particularly the RRRAs of 1993 and 1997, judicial determinations and . . . agency practice" (22 NY Reg [issue 14], Apr. 5, 2000, at 17). After public hearing and comment, DHCR adopted these changes, which became effective on December 20, 2000 (*see* 22 NY Reg [issue 51], Dec. 20, 2000, at 18-20 [notice of adoption]). As relevant to this appeal, DHCR amended section 2520.11 of the RSC, titled "Applicability," to provide that

> "[luxury decontrol] shall not apply to housing

accommodations which became or become subject to the RSL and this Code:

"(i) *solely* by virtue of the receipt of tax benefits pursuant to . . . section 11-243 (formerly J51-2.5) or section 11-244 (formerly J51-5) of the Administrative Code of the city of New York, as amended" (RSC [9 NYCRR] § 2520.11 [r] [5]; [s] [2] [emphasis added]).

And in February 2004, DHCR issued (and subsequently reissued in January 2007) Fact Sheet 36, entitled "High-Rent Vacancy Decontrol and High-Rent High-income Decontrol," which similarly specified that "[a]partments that are subject to rent regulation *only because of* the receipt [of J-51 benefits] do not qualify for high-rent vacancy decontrol" (emphasis added).

At some point after the RRRA was enacted, MetLife, with DHCR's approval (*see* RSL § 26-504.3 [b]), began charging market-rate rents for those rental units in the properties where the conditions for high rent/high income luxury decontrol were met. In late 2006, MetLife sold the properties to PCV/ST for $5.4 billion.

Months after the sale, plaintiffs—nine individuals who reside in seven apartments in the apartment complex—sued MetLife and PCV/ST on behalf of a putative class of all current and former tenants who allegedly were, or will be, charged rents that exceed rent stabilization levels for any period during which the landlord receives real estate tax benefits under the J-51 program. Specifically, plaintiffs claimed that "in or about 2001 or 2002, and continuing through the present time," defendants have "improperly and unlawfully charged thousands of tenants market rents, even as [defendants] have collected . . . tax benefits under the J-51 program," amounting to "nearly $25 million"; they alleged that about one quarter of the 11,200 apartments in the apartment complex had been luxury decontrolled. Plaintiffs sought a declaration that units in the properties would remain rent-stabilized "until the last applicable J-51 tax benefits period . . . has expired [in or about 2017 or 2018]," and that defendants would "comply with all appropriate legal requirements to deregulate the units." Plaintiffs also sought relief in the form of rental overcharges totaling $215 million and attorneys' fees.

PCV/ST and MetLife moved to dismiss the complaint for failure to state a cause of action, arguing that the RRRA's

exception to deregulation for apartments that "became or become" subject to the RSL "by virtue of" receiving J-51 tax benefits did not apply to the properties because they did not "become subject to" the RSL "by virtue" of the receipt of J-51 tax benefits. Rather, the apartment complex "became subject to rent stabilization in or prior to 1974," nearly two decades before MetLife first received J-51 benefits.

In a decision dated August 16, 2007, Supreme Court dismissed the complaint, reasoning that "the clear and unambiguous language of the RSL states that the luxury decontrol 'exclusion shall not apply to housing accommodations which became or become subject to this law (a) by virtue of receiving [J-51] tax benefits' " (2007 NY Slip Op 32639, *10, quoting RSL §§ 26-504.1, 26-504.2 [a]). Because the properties became subject to the RSL "18 years before applying for J-51 tax benefits," the court concluded that "defendants did not become subject to rent stabilization by virtue of receiving" these benefits (*id.* at *11).

Supreme Court further noted that this interpretation, adopted by DHCR, was consistent with the luxury decontrol laws, which were intended to "restore some rationality to a system which provides the bulk of its benefits to high income tenants" (*id.*, quoting *Noto v Bedford Apts. Co.*, 21 AD3d 762, 765 [1st Dept 2005] [internal quotation marks omitted]); that DHCR's interpretation of the statute, if not unreasonable or irrational, was entitled to deference; and that the Legislature's failure to amend the RSL in response to DHCR's interpretation when subsequently amending the luxury decontrol provisions showed that it acquiesced in this construction. Plaintiffs appealed.

The Appellate Division unanimously reversed Supreme Court's decision and order, and reinstated the complaint. The court concluded that building owners who receive J-51 benefits forfeit their rights under the luxury decontrol provisions even if their buildings were already subject to the RSL. According to the Appellate Division, the words "by virtue of" did not confine the exclusion from luxury deregulation to buildings that became subject to the RSL only because they received J-51 benefits; DHCR's interpretation of this provision was not entitled to deference because a pure issue of statutory reading and analysis was involved; if the Legislature had intended the provision to mean "solely by virtue of," as DHCR concluded, it would have used the word "solely"; its interpretation was "more consistent with the overall statutory scheme," which made no overt

distinction between properties "subject to" the RSL solely as a result of the owner's receipt of J-51 benefits and those "subject to" the RSL before receiving such benefits; and Supreme Court's reading "invite[d] absurd and irrational results" (*Roberts v Tishman Speyer Props., L.P.*, 62 AD3d 71, 83 [1st Dept 2009]).

The Appellate Division subsequently granted defendants' motion for leave to appeal, certifying the following question: "Was the order of this Court, which reversed the order of the Supreme Court, properly made?" For the reasons that follow, we answer affirmatively.

## II.

PCV/ST and MetLife argue principally that the relevant exception to luxury decontrol applies only to accommodations that "became or become" subject to the RSL "by virtue of receiving tax benefits pursuant to section . . . four hundred eighty-nine of the real property Tax Law [J-51 benefits]" (RSL §§ 26-504.1, 26-504.2 [a]). And since the word "become" means to "pass from a previous state or condition" or to "take on a new role, essence, or nature" (Webster's Third New International Dictionary of the English Language 195 [1963]), a rental unit can "become" subject to the RSL only when it passes from being unregulated to being regulated—i.e., when its status changes on account of the owner's receipt of J-51 benefits. By contrast, a rental unit does not "become" subject to the RSL by virtue of receiving J-51 benefits if it was already subject to rent stabilization. According to PCV/ST and MetLife, if the Legislature had intended to preclude luxury deregulation for all rent-stabilized apartments receiving J-51 benefits, it would have omitted the phrases "became or become" and "by virtue of" from the statute, and simply written that the exception did not apply to accommodations "receiving" such tax benefits. They note that the Legislature used this latter phraseology in RSL § 26-504 (c) (referring to "Dwelling units in a building or structure receiving the benefits of [J-51]").[2]

---

2. PCV/ST and MetLife also suggest that if we affirm the Appellate Division's decision and order, we should apply the statute prospectively rather than retroactively because they reasonably relied on DHCR's unambiguous and long-standing interpretation of the RSL's luxury decontrol provisions. Because the lower courts did not consider this issue—as defendants acknowledge—we do not consider it at this time.

## III.

PCV/ST and MetLife emphasize that since 1996 DHCR—the state agency entrusted with administering rent stabilization—has interpreted the luxury decontrol provisions in the manner they advocate. This is not, however, entirely correct; DHCR's interpretation and the one PCV/ST and MetLife now offer are different. DHCR has interpreted "by virtue of" to mean "solely by virtue of," while PCV/ST and MetLife rely on the "became or become" language of the statute. The two interpretations would lead to the same result in this case, but not in every case. For example, under DHCR's interpretation, a building that first became subject to the RSL due to receipt of J-51 benefits—but is also subject to the provisions of the RSL for some other reason (*see* RSL § 26-504)—would be subject to luxury decontrol because it would not be stabilized "solely" because of J-51 benefits. On the other hand, under the argument made by PCV/ST and MetLife, the same building would be exempt from luxury decontrol because it "became" subject to stabilization when the first triggering event—receipt of the J-51 benefits—occurred.

It is understandable that PCV/ST and MetLife prefer not to defend DHCR's reading, because it is contrary to the plain text of the statute. "By virtue of" and "solely by virtue of" simply do not mean the same thing. Nor do we owe deference to DHCR's reading, for this appeal does not call upon us to interpret a statute where "specialized knowledge and understanding of underlying operational practices or . . . an evaluation of factual data and inferences to be drawn therefrom" is at stake such that we should "defer to the administrative agency's interpretation unless irrational or unreasonable" (*Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal*, 5 NY3d 303, 312 [2005], quoting *Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459 [1980] [internal quotation marks omitted]). Rather, where

> "the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency and its interpretive regulations . . . And, of course, if the regulation runs counter to the clear wording of a statutory provision, it should not be accorded any weight" (*Kurcsics*, 49 NY2d at 459).

When construing a statute, we seek to discern and give effect to the Legislature's intent (*Carney v Philippone*, 1 NY3d 333, 339 [2004]), and the starting point for accomplishing this is the statute's language (*Matter of DaimlerChrysler Corp. v Spitzer*, 7 NY3d 653, 660 [2006]). If the language is ambiguous, we may examine the statute's legislative history (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]).

Here, we conclude that defendants' interpretation of the exception to luxury decontrol for units that "became or become" subject to rent stabilization "by virtue of receiving" J-51 benefits conflicts with the most natural reading of the statute's language. Defendants essentially read these words as recognizing two categories of J-51-benefitted buildings—those, like the properties, that were rent-stabilized prior to receiving J-51 benefits, for which luxury decontrol became available in 1993; and those that only became rent-stabilized as a condition of receiving J-51 benefits, for which luxury decontrol is unavailable (at least during the benefit period). But there is no language anywhere in the statute delineating these two supposed categories, and we see no indication that the Legislature ever intended such a distinction—one that never occurred to anyone, so far as this record shows, until after the present lawsuit was brought. Contrary to PCV/ST's and MetLife's argument, there is nothing impossible, or even strained, about reading the verb "become" to refer to achieving, for a second time, a status already attained.

Even assuming that the reading given to "became or become" by PCV/ST and MetLife is a possible one, the RRRA's legislative history better supports our interpretation of the statute. The RRRA's sponsor stated that luxury decontrol was unavailable to building owners who "enjoy[ed] another system of general public assistance" such as J-51 benefits (NY Senate Debate on Assembly Bill A8859, July 7, 1993, at 8214). Although the dissent accuses us of "pluck[ing] a snippet" of the sponsor's words to support our conclusion (dissenting op at 291), in response to a question posed by a colleague exploring the very issue presented here, he said that

> "should the exemptions contained in section 489 end, that's—those J.51s and 489s end, then they would be subject so that at no point do you have the [luxury] decontrol provisions applying to the buildings which have received the tax exemptions that I just mentioned" (Senate Debate at 8214).

The dissent's attempt to selectively highlight portions of the question does not diminish the force of the sponsor's answer, which plainly indicates that "at no point" would the luxury decontrol provisions apply to buildings which "received" tax exemptions being discussed, including J-51 benefits. Certainly it cannot be argued that the thrust of that statement indicates otherwise.

Nor will we infer, as defendants suggest, that the Legislature's inactivity in the face of DHCR's interpretation of the statute constitutes its acquiescence thereto. Legislative inactivity is inherently ambiguous and " 'affords the most dubious foundation for drawing positive inferences' " (*Clark v Cuomo*, 66 NY2d 185, 190-191 [1985], quoting *United States v Price*, 361 US 304, 310-311 [1960]). It is true that, where the practical construction of a statute is well known, the Legislature may be charged with knowledge of that construction and its failure to act may be deemed an acceptance (*Brooklyn Union Gas Co. v New York State Human Rights Appeal Bd.*, 41 NY2d 84, 90 [1976]). However, at the time the Legislature most recently considered the statute, there is no indication that the specific question presented here—that DHCR's interpretation is improper and conflicts with the plain language of the statute—had been brought to the Legislature's attention (*see Kurcsics*, 49 NY2d at 459 n 4).

## IV.

Defendants predict dire financial consequences from our ruling, for themselves and the New York City real estate industry generally. These predictions may not come true; they depend, among other things, on issues yet to be decided, including retroactivity, class certification, the statute of limitations, and other defenses that may be applicable to particular tenants. If the statute imposes unacceptable burdens, defendants' remedy is to seek legislative relief. Moreover, the dissent predicts that our decision will cause "years of litigation over many novel questions to deal with the fallout from today's decision" (dissenting op at 295). That the courts and litigants may experience some additional burden, however, is no reason to eschew what we view as the only correct interpretation of the statute (*cf. Matter of Gross v Perales*, 72 NY2d 231, 237 [1988]).

Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

READ, J. (dissenting). This appeal calls upon the Court to interpret an exception to the luxury decontrol mandated by the Legislature when it enacted the Rent Regulation Reform Act in 1993 (RRRA), "a first attempt to restore some rationality" to the then current rent regulation system by paring back the benefits conferred on "those not in economic need of protection" (Senate Mem in Support, 1993 NY Legis Ann, at 175). The exception reads as follows:

> "Provided, however, that this exclusion [for luxury decontrol] shall not apply to housing accommodations which became or become subject to [the Rent Stabilization Law (RSL)] (a) by virtue of receiving tax benefits pursuant to section [421-a] or [489] of the real property Tax Law . . . ,[1] or (b) by virtue of article seven-C of the multiple dwelling law" (RSL [Administrative Code of City of NY] §§ 26-504.1, 26-504.2 [a]).[2]

The majority interprets the portion of the exception dealing with Real Property Tax Law § 489 (which authorizes New York City's J-51 program) to exclude from luxury decontrol all buildings receiving J-51 tax benefits. Defendants, who point to DHCR's long-standing interpretation of the statute, read it to exempt only those buildings subject to the RSL solely because of the receipt of J-51 tax benefits. The majority takes the position that defendants' view is "contrary to the plain text of the statute" (majority op at 285), and "conflicts with the most natural reading of the statute's language" (*id.* at 286). I respectfully dissent.

## The Statutory Language

The majority's interpretation necessarily supposes that the Legislature inserted pointless words into the statute. That is, if the Legislature had intended for all buildings *receiving* J-51 tax benefits to be exempt from luxury deregulation, it could have easily said just that. Instead, the exception includes 10 additional words—excluding from luxury decontrol those buildings that "became or become subject to this law [the RSL] (a) by virtue of" receiving J-51 benefits. We generally assume that

---

1. The deleted language relates only to buildings receiving real property tax abatements under section 421-a of the Real Property Tax Law, and is not relevant to this case.

2. Hereafter, these provisions are referred to collectively as "the exception" or "the statute."

every word in a statute contributes something to its meaning (*see e.g. People v Finley*, 10 NY3d 647, 655 [2008], citing *People v Giordano*, 87 NY2d 441, 448 [1995], quoting *Sanders v Winship*, 57 NY2d 391, 396 [1982] ["Under well-established principles of interpretation, effect and meaning should be given to the entire statute and every part and word thereof" (internal quotation marks omitted)]).

Defendants' interpretation of the exception, unlike the majority's, gives meaning to all of its operative language. As defendants point out, the words "became" or "become" mean to "pass from a previous state or condition and come to be" or to "take on a new role, essence, or nature" (*see* Webster's Third New International Dictionary 195 [1986]). The definition of "subject" is "one that is placed under the authority, dominion, control, or influence of" (*id.* at 2275); and the parties do not dispute that "by virtue of" means "because of" or "by reason of." Thus, buildings that "became or become subject to [the RSL] by virtue of" receiving J-51 tax benefits passed from their former state (unregulated) into a new state (rent-stabilized) because of their owners' receipt of these benefits. That did not happen here since the apartment buildings comprising Peter Cooper Village and Stuyvesant Town have been rent-regulated since at least 1974, 18 years before any building in either complex is alleged to have received J-51 benefits. They did not "become" rent-stabilized by virtue of receiving J-51 benefits; they already *were* rent-stabilized (*see Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal*, 5 NY3d 303, 311-312 [2005] [once a building became rent-stabilized, later, redundant statutory routes "would not have (been) needed" to make the building subject to the RSL]).

The majority resists the logic of this reading on several bases; first, that "there is nothing impossible, or even strained, about reading the verb 'become' to refer to achieving, for a second time, a status already attained" (majority op at 286). While "become" may be used colloquially in this imprecise sense, we usually—in the absence of statutory definitions—look to dictionary definitions when trying to figure out the meaning of a word or phrase used in a statute (*see e.g. Rosner v Metropolitan Prop. & Liab. Ins. Co.*, 96 NY2d 475, 479-480 [2001]). Even accepting the majority's point, all this means is that defendants' reading of "become" is not clearly correct—i.e., the usage is ambiguous—not that it is clearly wrong, although this seems to be the majority's implicit conclusion.

The majority also takes issue with defendants' emphasis on the State Division of Housing and Community Renewal (DHCR)'s reading of the statute, stating that "DHCR's interpretation and the one [defendants] now offer are different" because "DHCR has interpreted 'by virtue of' to mean 'solely by virtue of,' while [defendants] rely on the 'became or become' language" (majority op at 285).[3] Further, the majority adds, " '[b]y virtue of' and 'solely by virtue of' simply do not mean the same thing" (*id.*).

In fact, what defendants argue is that the words "became or become subject to," read according to their dictionary meaning, modify the subsequent phrase "by virtue of" so as to create "no less a narrowing effect . . . than would 'solely.' " In short, by inserting "solely" before the phrase "by virtue of," DHCR simply created a redundancy in its regulations (*see* Rent Stabilization Code [RSC] [9 NYCRR] § 2520.11 [r] [5]; [s] [2]); it did not change the statute's meaning.

Finally, the majority objects that defendants' reading of the statute implicitly creates two categories of J-51-benefitted properties—i.e., "those . . . that were rent-stabilized prior to receiving J-51 benefits, for which luxury decontrol became available in 1993; and those that only became rent-stabilized as a condition of receiving J-51 benefits, for which luxury decontrol is unavailable (at least during the benefit period)"; and that there is "no indication that the Legislature ever intended such a distinction," or that it ever "occurred to anyone . . . until after the present lawsuit was brought" (majority op at 286).

Addressing the latter point first, it is not at all obvious that this distinction occurred to no one until this lawsuit.[4] Contrariwise, it is apparent (as discussed later) that, until this lawsuit, no one thought to argue that already rent-stabilized buildings

---

**3.** The majority also opines that these two purportedly divergent interpretations "would lead to the same result in this case, but not in every case," and then poses a hypothetical example to illustrate this point (majority op at 285). It is not evident that, in the real world (as opposed to the hypothetical one), the different results theorized would ever occur, absent changes in the current rent regulation/tax benefit regimes.

**4.** Amicus Rent Stabilization Association of NYC, Inc. provided us with a detailed history of the J-51 statute and rent regulation over several decades. The gist of this presentation (although disputed) is that by law and practice the New York City rent laws have long distinguished between apartments that became subject to rent regulation by virtue of receiving J-51 tax benefits, and apartments that were already rent-regulated for other reasons (like those in the Peter Cooper Village and Stuyvesant Town apartment complexes) at the time they received J-51 benefits.

subsequently receiving J-51 tax benefits were excluded from luxury decontrol.

As for what the Legislature intended, the distinction complained about by the majority flows naturally from the legislative language chosen (i.e., "become or became" and "by virtue of"), given the nature of the J-51 program. Two general categories of buildings are eligible for J-51 tax benefits. First, there are existing, already rent-stabilized apartment buildings (like those in the Peter Cooper Village and Stuyvesant Town apartment complexes), which receive J-51 benefits in connection with capital improvements or repairs, such as a new boiler (*see e.g.* Administrative Code of City of NY § 11-243 [b] [4], [5], [6]; Rules of City of NY Dept of Hous Preserv and Dev [28 RCNY] § 5-03 [b], [c]). The second category includes buildings that are substantially rehabilitated to create new family units and receive benefits on account of those conversions or rehabilitations (*see e.g.* Administrative Code § 11-243 [b] [2], [3], [8]; 28 RCNY 5-03 [a] [1], [2], [3], [4], [6], [7]). Buildings within the second category become rent-stabilized as a condition of receipt of J-51 benefits,[5] and enter the rent-stabilization regime at existing market rates (*see* Rent Stabilization Code [RSC] [9 NYCRR] § 2521.1 [h]). Again, if the Legislature had intended to exclude *all* buildings receiving J-51 tax benefits from luxury decontrol—i.e., those in both categories—it should have, and presumably would have, specified in the statute that housing accommodations *receiving* J-51 benefits were excluded, not just those that "became or become subject to [the RSL] by virtue of" receiving J-51 benefits.

### Legislative Intent

To bolster its textual analysis, the majority plucks a snippet from a floor exchange during the Senate debate on the bill that became the RRRA. We have always treated this species of legislative history "cautiously" (*see Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 586-587 [1998]). In any event, the full text of this question-and-answer dialogue (which follows) does not appear to support the meaning teased out of it by the majority:

---

5. Defendants point out that J-51-benefitted buildings within this second category are therefore akin to the other two kinds of buildings within the exception—those covered by Real Property Tax Law § 421-a (new construction) and article 7-C of the Multiple Dwelling Law (the 1982 Loft Law, which governs commercial loft buildings converted into residential housing)—which likewise are not otherwise rent-stabilized.

"SENATOR MENDEZ: Senator Hannon, your bill will include—will affect those renters who are in apartments J.51s and 421-As. O.K. Those *buildings were constructed* with some part of taxpayers' monies, monies from all of us, and all of the people out there in the state of New York to help the *developers build those apartments.*

"My question to you is, once this bill is approved here and it will pass this chamber, will *those landlords* keep and not get taken away, keep the decontrol of the so-called luxury apartments with the abatements, those tax abatements that they have negotiated, or will they be returned to the taxpayers?

"SENATOR HANNON: Well, *in answer to your question,* Senator, which is an excellent one, we have provided that, because some buildings are enjoying another system of general public assistance, namely the tax exemptions, that to the extent the building is currently enjoying a 421 tax exemption, it is not subject to the decontrol provisions here. Should those exemptions end or should the exemptions contained in section 489 end, that's—those J.51s and 489s end, then they would be subject so that at no point do you have the decontrol provisions applying to the buildings which have received the tax exemptions that I just mentioned" (Senate Debate on NY Assembly Bill A8859, July 7, 1993, at 8213-8214 [emphasis added]).

By referring to buildings that were *constructed* and to *developers* who *build* with tax benefits, Senator Mendez's question was directed at buildings entering the rent-stabilization regime for the first time as a condition of receiving J-51 tax benefits (i.e., the second category of J-51-benefitted properties, previously discussed), or section 421-a tax benefits (i.e., new construction). In short, Senator Hannon's response to Senator Mendez was limited by her question to developers of new construction projects.

Critically, the majority does not even mention the most important gauge of statutory meaning in this case, apart from the actual words the Legislature chose. The RRRA has a sunset clause, which forces the Legislature to reconsider its terms periodically. This has happened twice since 1996, when DHCR

issued its advisory opinion—in 1997 and in 2003.[6] While otherwise amending the RRRA in both 1997 and 2003, the Legislature left the language central to this appeal ("became or become subject to [the RSL] by virtue of") intact.

As plaintiffs themselves put it, "[b]attles over rent stabilization are among the fiercest in Albany." It is therefore doubtful that the Legislature was unaware in 1997 of DHCR's advisory opinion, especially in light of the existence of DHCR decontrol orders premised on it, and the New York City Department of Housing Preservation and Development (HPD)'s issuance of prorated J-51 tax benefits to buildings with luxury-decontrolled apartments. And it is inconceivable that the Legislature did not know what was afoot six years later in 2003. This is especially so because DHCR in the meantime revised the Rent Stabilization Code (RSC or the Code) for the express purpose of incorporating regulations implementing its interpretation of the substantive changes wrought by "the RRRAs of 1993 and 1997" (22 NY Reg [issue 51], Dec. 20, 2000, at 18).

After receiving and evaluating an "extensive volume and scope of comments," DHCR adopted the revised RSC, effective December 20, 2000 (id. at 19). The Code made DHCR's interpretation of RSL §§ 26-504.1 and 26-504.2 unmistakably clear: the exception from luxury decontrol for buildings receiving J-51 tax benefits covered only those buildings rent-stabilized solely on this basis (see RSC § 2520.11 [r] [5]; [s] [2]). Yet, the Legislature in 2003 did not amend the RRRA to adopt the interpretation favored by plaintiffs, although it otherwise modified the statute.

As we have observed,

"[q]uestionable as may be any reliance on legislative inactivity, we would distinguish instances in which the legislative inactivity has continued in the face of a prevailing statutory construction. Thus, '[w]here the practical construction of a statute is well known, the Legislature is charged with knowledge and its failure to interfere indicates acquiescence' " (Brooklyn Union Gas Co. v New York State Human Rights Appeal Bd., 41 NY2d 84, 90 [1976], quoting Engle v Talarico, 33 NY2d 237, 242 [1973]).

We were faced with a fact pattern comparable to this case in Matter of Ansonia Residents Assn. v New York State Div. of

---

**6.** The statute is next due for renewal in 2011 (see L 2003, ch 82, §§ 7, 8, 9).

*Hous. & Community Renewal* (75 NY2d 206 [1989]). There—as here—the tenants argued that the plain wording of a provision in the RSL conflicted with the way in which DHCR interpreted and implemented it. We observed that DCHR and its predecessor agencies had construed the statute consistently, however, and that "the local legislature, in never choosing to amend the statute to provide otherwise, has acquiesced in [DHCR's] construction" (*id.* at 215; *see also Rent Stabilization Assn. of N.Y. City v Higgins*, 83 NY2d 156, 170 [1993] [when concluding that DHCR was authorized to adopt challenged regulations, Court considered it significant that Legislature had not sought to undo DHCR's interpretation at a time when it was substantially reforming rent regulation]).

### Regulatory Interpretation and Implementation

The majority gives no weight whatsoever to DHCR's interpretation of the exception. DHCR is vested with a "broad mandate to promulgate regulations in furtherance of the rent control and rent stabilization laws" (*Higgins*, 83 NY2d at 168), and is steeped in the history and lore of rent regulation. While we may not owe deference to the administrative agency, it should count for something that DHCR adopted its interpretation as a formal regulation after a notice-and-comment rulemaking enjoying wide participation by both landlord and tenant advocacy groups and interests. If DHCR's interpretation were as wide of the mark as the majority claims, it is odd that this infirmity was not discovered then. In this regard, defendants point out that two of the amici supporting plaintiffs on this appeal[7] submitted over 50 pages of comments objecting to many aspects of DHCR's proposed amendments to the Code in 2000, but they never mentioned, much less complained about, the proposed rules codifying the word "solely" (*see* http://www.tenant.net/ DHCR_info/newcode/legserv-RSC.pdf).

Further, the majority ignores the manner in which HPD actually administers the J-51 program. HPD's J-51 application form requires the building owner to identify the number of both "exempt" and rent-stabilized apartments (*see* http:// www.nyc.gov/html/hpd/downloads/pdf/J51-application.pdf). The record on appeal includes a certificate of eligibility issued by HPD on July 28, 2003, awarding J-51 tax benefits to 350 First

---

**7.** There were six amicus briefs filed on behalf of plaintiffs. (Three amicus briefs were filed on behalf of defendants.)

Avenue, a building in the Peter Cooper Village complex. This certificate shows that HPD *reduced* the J-51 benefit in proportion to the number of luxury-decontrolled units in the building, consistent with DHCR's interpretation and regulation.

<u>Conclusion</u>

The majority downplays the risk of "dire financial consequences from [this] ruling[ ] for [defendants] and the New York City real estate industry" (majority op at 287). While it is true that dire predictions often prove to be mistaken, this is not always the case just because it usually is. After all, the Trojans would have done well to heed Cassandra. And you do not have to be gifted with her powers of prophecy to foresee significant, if not severe, dislocations in the New York City residential real estate industry as a result of today's decision. This is inevitable because the Court has upended an understanding of the law upon which numerous and substantial business transactions and dealings have been predicated for over a decade. On the other side of the equation, since at least 2000 no tenant residing in Stuyvesant Town or Peter Cooper Village has had any reason to expect immunity from the RSL's luxury-decontrol provisions.

The majority's observation that the extent of defendants' losses ultimately will turn on legal issues and defenses yet to be resolved is cold comfort. It will take years of litigation over many novel questions to deal with the fallout from today's decision. In the absence of meaningful legislative action, uncertainty will reign in an industry already rocked by the bursting of the great residential real estate bubble. And as one amicus reminded us, many of those at risk are "Mom and Pop" owners of a single building, and owners with midsized portfolios, mostly located outside Manhattan. For some of these entities, a prolonged summary proceeding with even a few tenants may threaten financial viability, even in the best of times.

Of course, I do not suggest that the Court shirk from its responsibility to interpret statutes because of untoward or uneven consequences for the parties. In every decision we make, one side loses. But the Court does not, in my view, fulfill its duty to safeguard the stability of the laws when it tosses out a reasonable and long-standing statutory interpretation made by a specialized agency, as it does today.

Thirty-five years ago we described the rent laws as "an impenetrable thicket, confusing not only to laymen but to lawyers" (*Matter of 89 Christopher v Joy*, 35 NY2d 213, 220 [1974]), and

the thicket has only grown denser since then. While the majority confidently proclaims that DHCR's and defendants' reading of the statute is plainly wrong, and its contrary interpretation is plainly correct, the opacity of the thicket guarantees that neither proposition is true. Accordingly, I respectfully dissent.

Judges CIPARICK, SMITH, PIGOTT and JONES concur in per curiam opinion; Judge READ dissents in a separate opinion in which Judge GRAFFEO concurs; Chief Judge LIPPMAN taking no part.

Order affirmed, etc.