868

[907 NYS2d 611]

Independence Plaza North Tenants' Association et al.,
Plaintiffs, v Independence Plaza Associates, L.P., et al.,
Defendants.

John R. Denza et al., Plaintiffs, v Independence Plaza Associates, L.P., et al., Defendants.

Supreme Court, New York County, August 30, 2010

### APPEARANCES OF COUNSEL

*Collins Dobkin & Miller, LLP*, New York City (*Seth A. Miller* and *Stephen Dobkin* of counsel), for plaintiffs. *Meister Seelig & Fein LLP*, New York City (*Stephen B. Meister* and *Stacey M. Ashby* of counsel), for defendants.

### OPINION OF THE COURT

Marcy S. Friedman, J.

In these declaratory judgment actions, plaintiffs seek a determination that they are rent-stabilized tenants of Independence Plaza North (IPN), a former Mitchell-Lama complex in Lower Manhattan. In the *Independence Plaza North Tenants' Association* action (*IPN* action), plaintiffs are tenants who were in possession of

apartments at IPN as of June 28, 2004, the date on which IPN exited the Mitchell-Lama program (exit date). In the *Denza* action, plaintiffs are tenants who entered into possession of apartments at IPN, under "free market" leases, after the exit date but while IPN was receiving J-51 benefits. Plaintiffs in both actions contend that their units are subject to the Rent Stabilization Law based on IPN's receipt of the J-51 benefits. Defendant owners contend that the City retroactively terminated the benefits as of the exit date, and that plaintiffs' units never became subject to rent stabilization after IPN's exit from the Mitchell-Lama program.

## Procedural History

By decision dated September 26, 2007, this court denied defendants' motion for summary judgment, without prejudice to renewal after completion of discovery regarding the circumstances under which IPN received J-51 benefits after the exit date and such benefits were terminated. The *Denza* plaintiffs subsequently moved to remand the matter to the New York State Division of Housing and Community Renewal (DHCR) for a determination of their rent-stabilized status. Defendants moved for summary judgment dismissing the complaint, and plaintiffs cross-moved for a declaration, in the event of denial of their remand motion, that their apartments are rent stabilized. These motions were decided by decision dated April 3, 2009 (remand decision). This decision stayed the parties' summary judgment motions pending remand to the DHCR. By stipulation dated April 23, 2009, the parties agreed to remand the *IPN* action to the DHCR for determination of the rent stabilization issue "under [the] same terms as [the] remand order" in the *Denza* action. By determination dated March 5, 2010, the DHCR held that IPN "is not subject to the Rent Stabilization Law and Code." (DHCR determination at 7, available at http://ipnta.org/pdfs/DHCR%20Determination_Mar_9_2010.pdf, cached at http://www.nycourts.gov/reporter/webdocs/DHCR_Determination_Mar_9_2010.pdf.)

In the *Denza* action, defendants now move to lift the stay of the action that was imposed pending the DHCR remand and for summary judgment dismissing plaintiffs' complaint, based on the DHCR determination. Plaintiffs cross-move for summary judgment declaring that their apartments are rent stabilized. In the *IPN* action, plaintiffs move for partial summary judgment declaring that their apartments are rent stabilized, and defend-

ants move to stay the *IPN* action pending determination of the *Denza* action.[1]

As discussed at greater length in the remand decision, the following material facts are undisputed: IPN, a complex containing 1,331 residential units, was constructed after January 1, 1974 and was rent regulated under the Mitchell-Lama program, pursuant to article II of the New York State Private Housing Finance Law.[2] In 1998, while IPN was rent regulated under the Private Housing Finance Law, it began to receive a J-51 tax abatement based on a qualifying major capital improvement. After 20 years, IPN exercised its option, pursuant to Private Housing Finance Law § 35 (2), to dissolve and exit the Mitchell-Lama program. J-51 abatements were initially granted in tax year 1998/1999, and continued to be granted, after IPN's June 28, 2004 exit from the Mitchell-Lama program, through tax year 2005/2006. In March 2006, the Department of Housing Preservation and Development (HPD) terminated the J-51 benefits effective as of the exit date, and defendants repaid all of the benefits received between the exit date and the retroactive termination.[3] The parties dispute whether the receipt of these benefits made plaintiffs' apartments subject to the Rent Stabilization Law.

## Remand

■ As a threshold matter, the court holds that it is not bound by, and declines to follow, the DHCR's remand determination. It

---

1. Defendants' first summary judgment motion, made prior to discovery, will be referred to as defendants' "pre-discovery summary judgment motion." The summary judgment motions that were held in abeyance pending the remand may be referred to as the "remand summary judgment motions." The instant motions restore the remand summary judgment motions and seek additional relief. In deciding the instant motions, the court will accordingly also consider the papers submitted on the remand summary judgment motions.

2. IPN is referred to as a "post-1974" development. The significance of the distinction between pre- and post-1974 developments is that dwelling units in buildings constructed or rehabilitated before January 1, 1974 and regulated under the Private Housing Finance Law become subject to rent stabilization after the Private Housing Finance Law regulation is terminated, regardless of whether they receive J-51 benefits. Dwelling units in buildings constructed after January 1, 1974 do not automatically become rent stabilized after they exit the Mitchell-Lama program and Private Housing Finance Law regulation ceases. (*See* Rent Stabilization Code [9 NYCRR] § 2520.11 [c].)

3. It is undisputed that the amount of IPN's J-51 tax abatement was $90,600 which, divided by the 12-year abatement period, amounted to $7,550 per year. IPN repaid the City $17,879.42, representing the amount of benefits received between the 2004 exit date and HPD's 2006 termination, plus interest.

is well settled that "[a]n administrative agency's interpretation of the statute it is charged with implementing is entitled to varying degrees of judicial deference depending upon the extent to which the interpretation relies upon the special competence the agency is presumed to have developed in its administration of the statute." (*Matter of Rosen v Public Empl. Relations Bd.*, 72 NY2d 42, 47 [1988].) "[W]here specialized knowledge and understanding of underlying operational practices or . . . an evaluation of factual data and inferences to be drawn therefrom is at stake . . . [the court] should defer to the administrative agency's interpretation unless irrational or unreasonable." (*Roberts v Tishman Speyer Props., L.P.*, 13 NY3d 270, 285 [2009] [internal quotation marks and citations omitted]; *Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459 [1980].) In contrast, "where the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency and its interpretive regulations." (*Roberts*, 13 NY3d at 285 [internal quotation marks omitted], quoting *Kurcsics*, 49 NY2d at 459.)

In remanding the issue of plaintiffs' rent stabilization status to the DHCR, this court reasoned that the Rent Stabilization Law does not explicitly address whether apartments in a building which, like IPN, qualified for J-51 benefits because it was regulated as a Mitchell-Lama project under the Private Housing Finance Law, become rent stabilized if the building continues to receive the same J-51 benefits after the building exits the Mitchell-Lama program. (*Denza v Independence Plaza Assoc., LLC*, 2009 NY Slip Op 30759[U], *8 [2009].) The court also reasoned that a central issue in this case is whether 28 RCNY 5-07 (f) (3), the regulation that implements the J-51 program, should be interpreted as mandating termination of J-51 benefits upon termination of the Private Housing Finance Law regulation. The court found that HPD did not cite section 5-07 (f) (3) as the basis for the termination, and did not otherwise take the position that the J-51 benefits terminated by operation of law, or that the regulatory framework mandated termination of the J-51 benefits upon IPN's exit from the Mitchell-Lama program. The court found, rather, that the evidence on the remand summary judgment motions "unequivocally confirm[ed] that HPD treated the termination of the benefits as a discretionary act, not as a mere ministerial act to correct the inadvertent continuation" of J-51 benefits after IPN's exit date. (*Id.* at *5.) The

court also cited apparent inconsistencies in HPD's position as to whether post-1974 Mitchell-Lama projects are subject to the Rent Stabilization Law upon exiting the Mitchell-Lama program, as a result of receipt of J-51 benefits at the time of exit. (*Id.* at \*6.) Having found that HPD exercised discretion in terminating IPN's J-51 benefits, the court held that there was a further issue, within the expertise of the DHCR, as to whether defendants waived the J-51 benefits in an impermissible attempt to avoid rent stabilization coverage. (*Id.* at \*6-7.) In directing the remand, the court noted that important issues as to the rent stabilization status of former Mitchell-Lama projects are now arising as the projects are "aging out" or qualifying to opt out of the Private Housing Finance Law regulation, and that the DHCR, as the administrator for dissolving Mitchell-Lama projects, has knowledge of, and experience with, the operational practices that have been followed for registration under the Rent Stabilization Law of former Mitchell-Lama projects. The court accordingly concluded that it should have the benefit of the DHCR's interpretation of the statute it administers before deciding the parties' summary judgment motions. (*Id.* at \*8-9.)

On remand, however, the DHCR did not draw upon its expertise to reach the merits of plaintiffs' claim of rent stabilization status. Rather, the DHCR held that HPD, as the agency that administers the J-51 program, had terminated the J-51 benefits for the complex effective as of the exit date. It further found that HPD's determination must be afforded a "presumption of regularity" and was "controlling" upon the DHCR. (DHCR determination at 6.) The DHCR reasoned:

> "In view of the fact that HPD terminated the J-51 tax abatement effective as of the dissolution date as part of the dissolution, the complex was not effectively receiving benefits subsequent to leaving Mitchell Lama regulation and, therefore, RSL 26-504c would not be applicable. Thus, IPN is not subject to the Rent Stabilization Law and Code. Since IPN did not become subject to rent stabilization in the first place, 28 RCNY [ ]5.0-3(f)(3), the provision of HPD's J-51 regulation that mandates continued rent regulation when J-51 benefits are revoked or waived would accordingly not be applicable to this matter, since according to HPD the benefits never attached after dissolution." (DHCR determination at 6.)

The DHCR thus in effect declined this court's request that it use its special expertise to interpret the statute it administers, and merely deferred to HPD's determination retroactively terminating the J-51 benefits. The DHCR neither interpreted and applied the Rent Stabilization Law nor discussed operational practices with other post-1974 developments that were receiving J-51 benefits as of the dates they exited the Mitchell-Lama program—in particular, whether such developments have been treated as rent stabilized based on their continuing receipt of J-51 benefits. On the authority cited above, therefore, there is no basis for the court to defer to the DHCR's determination.

The court finds, moreover, that the DHCR's analysis misapprehended the issues that must be decided in order to determine plaintiffs' rent stabilization status. The issue is not whether HPD terminated the J-51 benefits, but whether the dwelling units at IPN became subject to the Rent Stabilization Law as a result of the receipt of the benefits, and whether the termination was the result of a waiver of the benefits by defendants. Determination of this issue presents difficult and novel issues of interpretation of a complex regulatory framework,[4] to which the court now turns.

## Discussion

J-51 benefits are authorized and governed by the Real Property Tax Law, the Administrative Code of the City of New York, and the Rules of the City of New York. RPTL 489 (1) (a) authorizes municipalities to exempt from taxation increases in the assessed valuation of real property resulting from qualifying alterations or improvements. Administrative Code of the City of New York § 11-243 (formerly Administrative Code § J51-2.5) is the local legislation that provides for tax exemptions for qualifying improvements pursuant to the RPTL. The Rules of the City of New York (28 RCNY 5-01 et seq. [J-51 rules]) implement the local legislation. Administrative Code § 11-243 (i) (1) provides that J-51 benefits

"shall not apply: . . .

"[with exceptions not here relevant] to any existing dwelling which is not subject to the provisions of the emergency housing rent control law or to the

---

4. The rent stabilization scheme has been described by the Court of Appeals as a "maze" or "patchwork of legislation," and "an impenetrable thicket confusing not only to laymen but to lawyers." (La Guardia v Cavanaugh, 53 NY2d 67, 70 [1981] [internal quotation marks and citation omitted].)

city rent and rehabilitation law or to the city rent stabilization law or to the private housing finance law or to any federal law providing for supervision or regulation by the United States department of housing and urban development."

28 RCNY 5-03 (f) requires a building receiving J-51 benefits to be subject to rent regulation during the period of receipt of such benefits. Under this section, dwelling units in the building may be subject to any of the enumerated alternative forms of rent regulation—namely, the Rent Control Law, the Rent Stabilization Law, the Private Housing Finance Law, any federal law providing for rent supervision or regulation by any federal agency, and the Emergency Tenant Protection Act of 1974.[5] 28 RCNY 5-07 (f) provides, with exceptions not here relevant, that the Commissioner of the Department of Finance or of the Department of Housing Preservation and Development

"shall withdraw tax exemption and tax abatement granted to a building pursuant to the [RPTL] Act upon the happening of any of the following events:

. . .

"(3) The building ceases to be subject to the rent regulatory provisions of law set forth in § 5-03(f)(1)."

28 RCNY 5-03 (f) (3) (ii) provides: "Rent regulation shall not be terminated by the waiver or revocation of tax benefits."

In its denial of defendants' pre-discovery summary judgment motion, the court stated that 28 RCNY 5-07 (f) (3) appeared to contemplate that J-51 benefits would be terminated by the City of New York where the building ceased to be subject to the form of rent regulation that qualified it for receipt of J-51 benefits—

---

**5.** 28 RCNY 5-03 (f) provides:

"Rent regulatory requirements. (1) Rent regulation generally mandatory. In order to be eligible to receive tax benefits under the Act and for at least so long as a building is receiving the benefits of the Act, . . . all dwelling units in buildings or structures converted, altered or improved shall be subject to rent regulation pursuant to:

"(i) the City Rent and Rehabilitation Law (§ 26-401 et seq. of the Administrative Code); or

"(ii) the Rent Stabilization Law of 1969 (§ 26-501 et seq. of the Administrative Code); or

"(iii) the Private Housing Finance Law; or

"(iv) any federal law providing for rent supervision or regulation by HUD or any other federal agency; or

"(v) the Emergency Tenant Protection Act of 1974."

here, regulation under the Private Housing Finance Law as a Mitchell-Lama project. (*Denza v Independence Plaza Assoc., LLC*, 17 Misc 3d 1122[A], 2007 NY Slip Op 52106[U], *3-4 [2007].) The court did not make a final determination as to proper interpretation of section 5-07 (f) (3), as it found that the record was inexplicably silent as to the circumstances under which the J-51 benefits continued to be granted and were terminated, and that discovery should be had on this issue. (*Id.* at *4, *6.) As the court subsequently recognized, with the benefit of the fully developed record submitted on the renewed summary judgment motions, the initial interpretation of section 5-07 (f) (3) did not take into account that the Commissioner would not be required to terminate the J-51 benefits if, upon the termination of the first rent regulation, the units became subject to another form of rent regulation—specifically, the Rent Stabilization Law. (*Denza v Independence Plaza Assoc., LLC*, 2009 NY Slip Op 30759[U], *3-4 [2009].)

█ The court now holds that 28 RCNY 5-07 (f) (3) does not provide for mandatory termination of J-51 benefits when a Mitchell-Lama project exits the program, and that IPN became subject to the Rent Stabilization Law upon exiting the program as a result of its receipt of J-51 benefits. By its terms, 28 RCNY 5-07 (f) (3) requires the Commissioner of HPD to withdraw J-51 tax exemption benefits granted to a building only where "[t]he building ceases to be subject to the rent regulatory provisions of law set forth in § 5-03(f)(1)." Defendants do not cite any legal authority in support of their reading of 28 RCNY 5-07 (f) (3) as requiring termination of J-51 benefits by operation of law when a building exits the Mitchell-Lama program and the Private Housing Finance Law (i.e., Mitchell-Lama) regulation that qualified the building for the receipt of J-51 benefits therefore ceases. As the discovery in this action revealed, HPD itself did not advance such a reading of the regulation. (*See infra* at 878-880.) Nothing in the language of section 5-07 (f) (3) or of section 5-03 (f) (1) provides for mandatory termination of the J-51 benefits when the initial form of rent regulation that qualified a building for J-51 benefits ends.[6] On the contrary, section 5-03 (f) (1) provides that "[i]n order to be eligible to receive tax benefits

---

6. There is also no support for defendants' contention that 28 RCNY 3-14 (i) (12) contemplates termination of J-51 benefits effective as of the Mitchell-Lama exit date. This regulation provides: "On the date of dissolution . . . , both rental and mutual housing companies shall send written notification to the Department of Finance that the property owned by the housing company is to be restored to a full taxpaying position effective the date of dissolution."

under the Act *and for at least so long as a building is receiving the benefits of the Act*" (emphasis supplied), all dwelling units in the building shall be subject to one of the enumerated forms of rent regulation.

These J-51 regulations must also be read in light of Rent Stabilization Law (Administrative Code) § 26-504. The first sentence of section 26-504 (c) provides that the Rent Stabilization Law shall apply to "[d]welling units in a building or structure receiving the benefits of section 11-243 or section 11-244 [formerly sections J51-2.5 and J51-5.0] of the code . . . not owned as a cooperative or as a condominium, [with exceptions not here relevant] and not subject to chapter three of this title [Rent Control]." (Local Law No. 60 [1975] of City of NY § 12 [adding this provision to former Administrative Code § YY51-3.0, the substantially identical predecessor of section 26-504 (c)].) This provision is subject to section 26-504 (a) (1) (b), which exempts from rent stabilization coverage dwelling units in a building subject to regulation under the Private Housing Finance Law. Section 26-504 (a) (1) (b) and (c) must be given their "natural reading." (*See generally Roberts*, 13 NY3d at 286.) Read together, these sections extend rent stabilization coverage to units in buildings based on receipt of J-51 benefits if, but only if, the building is no longer rent regulated under the Private Housing Finance Law. Put another way, upon the termination of a statutory exemption from rent stabilization coverage, the units revert, or become subject, to coverage,

---

This regulation is not part of the J-51 regulations but, rather, implements the Mitchell-Lama program. The Mitchell-Lama program provides for its own tax exemptions, separate and apart from J-51 tax exemptions, as a means of encouraging the development of low- and middle-income housing. (*See* Private Housing Finance Law §§ 11, 33; *Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal*, 5 NY3d 303 [2005].) There is no mention in the regulation of J-51 benefits, and no authority that supports defendants' supposition that the regulation requires notice of a Mitchell-Lama project's ineligibility, as a result of dissolution, for anything other than the tax benefits provided to Mitchell-Lama projects under the Private Housing Finance Law.

Similarly, defendants submit a letter from IPN to the Department of Finance, dated June 28, 2004, which by its terms gives notice, pursuant to 28 RCNY 3-14 (i) (12), of the dissolution of IPN effective as of June 28, 2004, and advises: "In connection with such dissolution, the Property shall forthwith be restored to a full taxpaying position effective as of the dissolution Date." (Exhibit A to Siroka aff on remand motion.) This letter is silent as to J-51 benefits. There is no authority for defendants' contention that the letter is anything other than a notice of IPN's ineligibility, as a result of dissolution, for the tax benefits provided to Mitchell-Lama projects under the Private Housing Finance Law, as opposed to J-51 tax benefits received under the RPTL.

notwithstanding the lack of an "express provision" directing coverage upon termination of the exemption. (*See Federal Home Loan Mtge. Corp. v New York State Div. of Hous. & Community Renewal*, 87 NY2d 325, 333 [1995] [holding that as soon as a multiple dwelling is no longer subject to exemption (there, for cooperatives), the Rent Stabilization Law and Rent Stabilization Code "again automatically become applicable to it" (internal quotation marks and citation omitted)].)

In the instant case, it is undisputed that IPN continued to receive J-51 benefits for two years after it exited the Mitchell-Lama program. On the above analysis of the statutory and regulatory framework, as a result of the receipt of such benefits, all dwelling units at IPN became subject to regulation under the Rent Stabilization Law after IPN exited the Mitchell-Lama program.

The court notes that its interpretation of the statute is supported by the DHCR's own analysis. In its remand determination, the DHCR thus stated:

> "Since IPN was constructed after January 1, 1974, the only basis for a finding that the complex is subject to rent stabilization, based on the Rent Stabilization Law itself, is derived from the provisions of Section 26-504c of the Rent Stabilization Law ('RSL'). The RSL provides, in substance, that dwelling units in a building that is receiving the benefits of a J-51 Tax Abatement are subject to the law. Thus, if the complex received J-51 benefits for the period after it exited the Mitchell Lama program, on June 28, 2004, the development is subject to rent stabilization." (DHCR determination at 5-6.)[7]

The court's analysis of the statutory and regulatory framework is also fully consistent with HPD's determination terminating the benefits. As held in the remand decision and reaffirmed here, HPD's determination to terminate IPN's J-51 benefits was discretionary not mandatory. The basis for HPD's determination is evidenced solely by the following three records: First, a Department of Finance Web site showed March 29, 2006 as a "change date," with the sole "comment" that J-51 benefits were "terminated 6/28/04." Second, a letter from HPD to the Department of Finance, dated March 23, 2006 (exhibit Q to plaintiffs' remand cross motion), stated in pertinent part:

---

7. As noted above, however, the DHCR held itself bound by HPD's retroactive termination of the J-51 benefits, and treated the benefits as never having been received.

"It has come to our attention that, while the Mitchell Lama [tax] Exemption was properly terminated as of the Dissolution Date, the Property continues to receive the J-51 Abatement.

"HPD has determined that the J-51 Abatement should have been terminated, and the Property should have been restored to full taxpaying status, on the Dissolution Date. HPD therefore requests that the Department of Finance adjust its records to reflect the termination of the J-51 Abatement as of the Dissolution Date."

Third, a letter from HPD's then Commissioner Shaun Donovan to Borough President Scott Stringer, dated June 7, 2006 (exhibit J to plaintiffs' remand cross motion), explained: "HPD, after reviewing the facts as well as *equitable and public policy considerations*, determined that the J-51 Abatement should have been terminated on the Dissolution Date." (Emphasis supplied.) This letter further stated that when IPN left the Mitchell-Lama program, the owner and tenant association negotiated an "exceptional agreement" that provided "lifetime rent protection," and that to undermine the settlement "would not only potentially harm the tenants of IPN," but could have "a chilling effect on negotiations" between landlords and tenants in other Mitchell-Lama projects.

Clearly, none of the three records which evidences HPD's determination to terminate IPN's J-51 benefits made any mention of 28 RCNY 5-07 (f) or of any statutory or regulatory requirement that J-51 benefits be terminated upon the termination of the form of rent regulation (here, Private Housing Finance Law or Mitchell-Lama) that qualified the premises for the receipt of J-51 benefits. Nor did any of these records indicate that upon IPN's exit from the Mitchell-Lama program, the J-51 benefits terminated by operation of law, or that HPD's retroactive termination was a ministerial act to correct an inadvertent continuation of J-51 benefits after IPN exited the program. On the contrary, the Commissioner's letter makes clear that HPD exercised its discretion in terminating the J-51 benefits, taking into account "equitable and public policy considerations."

The discretionary nature of HPD's determination is highlighted by the fact that, in the case of Starrett City, a massive post-1974 project which was receiving J-51 benefits as of the date the project exited the Mitchell-Lama program, HPD took an apparently contrary position on the effect of receipt of J-51 benefits as of the exit date. Thus, in testimony before Congress

in July 2007 (exhibit K to plaintiffs' remand cross motion at 3), Commissioner Donovan stated that nearly three quarters of the units at Starrett City receive a J-51 tax exemption "which makes them subject to rent stabilization at [Mitchell-Lama] buy-out."

In holding that plaintiffs' units are covered by the Rent Stabilization Law, the court categorically rejects defendants' contention that IPN never received J-51 benefits after it exited the Mitchell-Lama program, and therefore could not have become subject to the Rent Stabilization Law as the result of receipt of such benefits. As this court held in denying defendants' pre-discovery summary judgment motion, defendants' claim that they never received J-51 benefits after the exit date is a mere legal fiction based on HPD's retroactive termination of the benefits in 2006 and defendants' repayment of benefits actually received between the June 28, 2004 exit date and HPD's termination. (*Denza v Independence Plaza Assoc., LLC*, 17 Misc 3d 1122[A], 2007 NY Slip Op 52106[U], *2-3 [2007].)

The court also rejects defendants' contention that plaintiffs' claims are barred by HPD's termination of the benefits because their sole remedy for challenging HPD's determination was to bring a CPLR article 78 proceeding which is now time-barred. The cases cited by defendants do not support this contention, as they all involved determinations by government agencies that were conducted publicly and on notice to the aggrieved parties who were then held subject to the statute of limitations for challenge to the agencies' determinations. (*Branch v Riverside Park Community LLC*, 74 AD3d 634 [1st Dept 2010], *affg* 24 Misc 3d 1226[A], 2009 NY Slip Op 51626[U] [Sup Ct, NY County 2009] [statute of limitations barred petitioner tenants' article 78 proceeding challenging Educational Construction Fund resolution to amend ground lease to delete requirement that building was to be used only for residential purposes for low- and moderate-income persons, where resolution was made after public hearing]; *90-92 Wadsworth Ave. Tenants Assn. v City of N.Y. Dept. of Hous. Preserv. & Dev.*, 227 AD2d 331 [1st Dept 1996] [statute of limitations barred petitioner tenants' article 78 proceeding challenging HPD approval of loan, where loan was made after HPD had complied with all notice requirements to tenants]; *Holman v Goldome Bank*, 127 Misc 2d 615 [Sup Ct, NY County 1985] [statute of limitations barred plaintiff tenants' declaratory judgment action, which could have been brought as article 78 proceeding, to challenge HPD approval of

loan to enable renovation, after which HPD would authorize restructuring of rents, where Private Housing Finance Law mandated tenant involvement before loan approval].)

Under the circumstances here, where no public hearing was held, plaintiffs had no obligation to challenge HPD's determination in an article 78 proceeding. Defendants do not claim that there was any statutory or regulatory requirement that plaintiffs be given notice before HPD made its determination terminating the J-51 benefits. Indeed, as discussed more fully below, the record demonstrates that HPD made the determination after holding closed-door meetings with defendant owners' representatives. There is also a serious question as to whether plaintiffs would have had standing to challenge termination of an owner's tax abatement. (*See generally Branch v Riverside Park Community LLC*, 74 AD3d 634 [2010], *supra*.)

In any event, a challenge to HPD's determination was not necessary, as HPD's retroactive termination of benefits does not preclude the finding that plaintiffs' units are rent stabilized. While according full force and effect to HPD's retroactive termination, the court holds, as stated above, that the issue is not whether the benefits were terminated but whether they were waived. Significantly, in terminating the benefits, HPD did not have jurisdiction to make, and did not make, any finding that plaintiff's units were not subject to the Rent Stabilization Law. Nor did HPD address the critical issue of whether defendants were waiving the J-51 benefits.

The court further holds that the uncontroverted record on the summary judgment motions demonstrates as a matter of law not only, as already held, that HPD's determination to terminate the benefits was discretionary, but also that HPD's determination was made at defendants' instance and was based on an impermissible waiver by defendants of benefits that is ineffective, under 28 RCNY 5-03 (f) (3) (ii), to terminate rent stabilization coverage of plaintiffs' units.

More particularly, HPD terminated the benefits only after plaintiffs made an inquiry to defendants about the effect of continuing receipt of J-51 benefits on plaintiffs' tenancies. By letter dated July 20, 2005 (exhibit F to plaintiffs' remand cross motion), the president of IPN's tenants association wrote to Laurence Gluck, defendants' principal, advising him that the tenants had become aware of IPN's continuing receipt of J-51 benefits, and asking the owner to address the impact on the tenancies. Following this letter, between September 2005 and

March 2006, defendants' representatives met with HPD officials in three private meetings at HPD. (Deposition of Martin Siroka at 71, 125 [exhibit H to plaintiffs' remand cross motion].) Defendants were represented by, among others, Martin Siroka, the former deputy general counsel of HPD, and Felice Michetti, the former Commissioner of HPD. The HPD officials who attended these meetings included then Commissioner Shaun Donovan and HPD's counsel Matthew Shafit.

According to Mr. Siroka's testimony, as of IPN's exit date, HPD had "no automatic process" for terminating J-51 benefits (*see id.* at 96-97), and the issue of whether to terminate the J-51 benefits for an exiting post-1974 Mitchell-Lama project was one of "first impression" for HPD. (*Id.* at 51, 97.) Mr. Siroka repeatedly testified that, at the meetings, defendants presented "our position" that when IPN exited the Mitchell-Lama program, the Commissioner should have terminated the J-51 benefits under the J-51 regulations. (*Id.* at 45, 62-63, 72.) He also confirmed that defendants submitted a brief to HPD in support of their position, although defendants' position was not otherwise documented in writing. (*Id.* at 64-66; exhibit G to remand motion, separately bound exhibits [e-mail from Siroka to Shafit, dated Sept. 8, 2005, annexing brief].)

Only after this series of meetings between defendants and HPD did HPD issue the March 2006 letter, cited above, notifying the Commissioner of Finance to terminate IPN's J-51 benefits retroactively. Defendants do not point to any evidence and, in fact, do not even claim, that HPD undertook, sua sponte, to review IPN's receipt of J-51 benefits. Rather, the only supportable inference on this record, including defendants' own counsel's testimony as to the proceedings before HPD, is that defendants requested that HPD retroactively terminate IPN's J-51 benefits, and HPD then exercised its discretion to grant defendants' request. As IPN had become subject to the Rent Stabilization Law based on the receipt of those benefits, however, the waiver was ineffective, under 28 RCNY 5-03 (f) (3) (ii), to terminate rent stabilization coverage. (*See also Matter of Fashion Place Assoc. v New York City Dept. of Hous. Preserv. & Dev.*, 224 AD2d 280 [1st Dept 1996], *lv dismissed* 89 NY2d 917 [1996] [waiver of J-51 tax benefits ineffective to terminate rent stabilization status of post-1985 tenants].)

Finally, the court holds that each plaintiff's apartment is subject to rent stabilization coverage until vacancy of that apartment by the tenant, based on defendants' failure to comply with

statutory and regulatory requirements for vacancy decontrol (i.e., destabilization). Rent Stabilization Law § 26-504 (c) and Rent Stabilization Code (9 NYCRR) § 2520.11 (o) both provide that where a building is subject to rent stabilization based on the receipt of J-51 benefits, upon the expiration or termination of such benefits, the unit shall remain subject to rent stabilization until the first vacancy after the benefits are no longer being received, or until the expiration of the tax benefit period if the leases and renewal leases have contained the requisite notice that the unit shall become subject to deregulation upon the expiration of the tax benefit period.[8] Here, it is undisputed that defendants did not include the decontrol notice in any of the

---

8. The 1985 amendment to Rent Stabilization Law § 26-504 (c) provides in pertinent part:

"Upon the expiration or termination for any reason of the benefits of section 11-243 or section 11-244 of the code [J-51] . . . any such dwelling unit shall be subject to this chapter until the occurrence of the first vacancy of such unit after such benefits are no longer being received or if each lease and renewal thereof for such unit for the tenant in residence at the time of the expiration of the tax benefit period has included a notice in at least twelve point type informing such tenant that the unit shall become subject to deregulation upon the expiration of such tax benefit period and states the approximate date on which such tax benefit period is scheduled to expire, such dwelling unit shall be deregulated as of the end of the tax benefit period; provided, however, that if such dwelling unit would have been subject to this chapter or the emergency tenant protection act of nineteen seventy-four in the absence of this subdivision, such dwelling unit shall, upon the expiration of such benefits, continue to be subject to this chapter or the emergency tenant protection act . . . ."

Rent Stabilization Code § 2520.11 provides, in pertinent part, that the Code shall apply to all housing accommodations made subject to regulation pursuant to the Rent Stabilization Law, except:

"(o) housing accommodations in buildings completed or substantially rehabilitated as family units on or after January 1, 1974, . . . and which were originally made subject to regulation solely as a condition of receiving tax benefits pursuant to section 11-243 (formerly J51-2.5) . . . of the Administrative Code of the City of New York, as amended . . . ; and thereafter receipt of such tax benefits has concluded pursuant to these sections . . . , and:

"(1) for housing accommodations which were subject to the RSL pursuant to section 11-243 (formerly J51-2.5) . . . became vacant; or

"(2) for housing accommodations which received benefits pursuant to section 11-243 (formerly J51-2.5) . . . , each lease and each renewal thereof of the tenant in residence at the time of the expiration of the tax benefit period includes a notice, in at least

plaintiffs' leases. Each apartment therefore remains subject to the Rent Stabilization Law until vacancy.

RPTL 489 (7) (b) (2),[9] on which defendants rely, is not to the contrary. This statutory provision authorized localities to adopt legislation providing that if a dwelling unit was subject to rent regulation on or before its effective date, June 19, 1985, as a result of receiving J-51 benefits, then the unit shall remain subject to regulation until the first vacancy after the J-51 benefits are no longer being received unless the leases of the tenant in occupancy have given the tenant notice that the unit will be deregulated at the end of the J-51 benefit period. Defendants argue that this provision does not apply to IPN because it was not subject to rent regulation "as a result of" its receipt of J-51 benefits, but rather qualified to receive J-51 benefits because it was subject to rent regulation under the Private Housing Finance Law. The court has rejected this argument for the reasons already stated.

Defendants also contend that because IPN first received J-51 benefits after June 19, 1985, its receipt of the J-51 benefits does not subject it to rent stabilization under this RPTL provision. This contention is barred by *Roberts v Tishman Speyer Props., L.P.* (13 NY3d 270 [2009], *supra*) in which the Court of Appeals recently held that J-51 benefits first received in 1992 made an apartment complex subject to rent stabilization and precluded

---

12-point type informing such tenant that the housing accommodation shall become deregulated upon the expiration of the last lease or rental agreement entered into during the tax benefit period, and states the approximate date on which such tax benefit period is scheduled to expire."

9. RPTL 489 (7) (b) (2) provides:

"Any dwelling unit subject to rent regulation on or before the effective date of this subparagraph [June 19, 1985] as a result of receiving a tax exemption or abatement pursuant to this section shall be subject to such regulation until the occurrence of the first vacancy of such unit after such benefits are no longer being received at which time such unit shall be deregulated or if each lease and renewal thereof for such unit for the tenant in residence at the time of the expiration of the tax benefit period has included a notice in at least twelve point type informing such tenant that the unit shall become subject to deregulation upon the expiration of such tax benefit period and states the approximate date on which such tax benefit period is scheduled to expire, such dwelling unit shall be deregulated as of the end of the tax benefit period; unless such unit would have been subject to regulation under the rent stabilization law of nineteen hundred sixty-nine or the emergency tenant protection act of nineteen seventy-four."

the owners from invoking the luxury decontrol provisions of the Rent Stabilization Law. (*See also Matter of Fashion Place Assoc. v New York City Dept. of Hous. Preserv. & Dev.*, 224 AD2d 280 [1996], *supra*.)

Defendants' emphasis on RPTL 489 (7) (b) (2) ignores that this statute does not preclude rent stabilization coverage under other provisions that are part of the regulatory framework. Prior to the enactment of section 489 (7) (b) (2), the receipt of J-51 benefits subjected dwelling units in a building to rent regulation only during the period in which the J-51 benefits were received. (*See* L 1985, ch 288, § 6.) The enactment of this statute provided retroactive vacancy decontrol protection to tenants who were covered by rent stabilization as a result of the owner's receipt of J-51 benefits as of the June 19, 1985 effective date. As this court noted in its September 26, 2007 decision, section 489 (7) (b) (2) is of limited application. While it applies only if J-51 benefits were received before its effective date (*Walsh v Wusinich*, 32 AD3d 743 [1st Dept 2006] [dictum]), it is part of a larger regulatory scheme which extends rent stabilization coverage to buildings that receive benefits after June 1985.[10] For the reasons discussed at length above, IPN is such a building, and the units of plaintiffs who were tenants at the time IPN received such benefits are accordingly not subject to the vacancy destabilization provision contained in section 489 (7) (b) (2), but are protected by the vacancy destabilization provisions set forth in Rent Stabilization Law § 26-504 (c) and Rent Stabilization Code § 2520.11 (o).

The court is unpersuaded by defendants' argument that they could not have anticipated the applicability of the vacancy destabilization provisions and, hence, could not have included notices in their tenants' leases that rent stabilization would

---

10. *Walsh v Wusinich* (32 AD3d 743 [2006], *supra*) involved a claim by a tenant in occupancy that she had a right, superior to that of the tenant of record, to purchase shares allocated to her apartment in a former Mitchell-Lama complex that was converted to cooperative ownership. The court appears to state that the former Mitchell-Lama complex did not become subject to rent stabilization because RPTL 489 (7) (b) (2) applies only if the tax benefits were received on or before its June 19, 1985 effective date, not the case for the complex in question. This statement was dictum, however, as the plaintiff brought her claim under General Business Law § 352-eeee (2) (d), which the court held applied only to an eviction plan, also not the case for the conversion at issue. To the extent that *Walsh* can be construed as holding that RPTL 489 (7) (b) (2) precludes coverage based on post-1985 receipt of J-51 benefits, it is inconsistent with *Roberts v Tishman Speyer Props., L.P.* (13 NY3d 270 [2009], *supra*).

terminate upon the expiration of the J-51 benefits. Defendants are sophisticated developers of a major development who had access to the most knowledgeable counsel in the field. As discussed above, their own counsel acknowledged that the effect of J-51 benefits on rent stabilization coverage of post-1974 projects was an issue of first impression. At the time defendants received J-51 benefits, or before IPN's exit from the Mitchell-Lama program,[11] defendants could have avoided the possibility that IPN would become subject to the vacancy destabilization provisions by the simple expedient of including the notices in its IPN leases.

## Conclusion

Finally, the court recognizes that at the time of IPN's exit from the Mitchell-Lama program, defendants entered into a reasonable agreement with the tenants to accept Section 8 vouchers for those who qualified, and to provide long-term rent protection with limited rent increases, which tracked or did not significantly exceed rent stabilization increases, for tenants who did not qualify for vouchers. Defendants understandably are aggrieved by the tenants' repudiation of this agreement. However, this agreement cannot serve to void the coverage of plaintiffs' units under the Rent Stabilization Law, and defendants do not argue otherwise. (*See Riverside Syndicate, Inc. v Munroe*, 10 NY3d 18 [2008]; Rent Stabilization Code § 2520.13 [an agreement by a tenant to waive the benefit of any provision of the Rent Stabilization Law is void].) This court is accordingly constrained, by defendants' own waiver of the J-51 benefits, to conclude that plaintiffs' units are subject to the Rent Stabilization Law.

Accordingly, in *Independence Plaza N. Tenants' Assn. v Independence Plaza Assoc., L.P.* (index No. 113831/04), it is ordered that plaintiffs' motion for partial summary judgment is granted to the extent that it is ordered, adjudged and decreed that each plaintiff's apartment is subject to the Rent Stabilization Law and shall remain subject until the vacancy of that apartment by the tenant of that apartment; and it is further ordered that defendants' motion to stay determination of this action is denied as moot; and in *Denza v Independence Plaza Assoc., L.P.* (index No. 117673/05), it is ordered that defendants' motion is granted

---

11. The court need not decide the earliest date as of which the notices should have been included in the leases, as it is undisputed that the notices were not included at any time.

to the extent of lifting the stay of determination of the action and is otherwise denied; and it is further ordered that plaintiffs' cross motion for summary judgment is granted to the extent that it is ordered, adjudged and decreed that each plaintiff's apartment is subject to the Rent Stabilization Law and shall remain subject until the vacancy of that apartment by the tenant of that apartment.